IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HIGH POINT SARL,                          )
                                          )
        Plaintiff and Counterclaim-Defendant,   )
                                          )
v.                                        )        Case No. 09-2269-CM
                                          )
SPRINT NEXTEL CORPORATION, *et al.*,      )
                                          )
        Defendants and Counterclaimants.  )
                                          )
_____  )

## MEMORANDUM AND ORDER

Plaintiff High Point Sarl ("High Point") alleges that defendants Sprint Nextel Corporation;

Sprint Spectrum L.P.; Sprintcom, Inc.; Sprint Communications Company L.P.; Sprint Solutions, Inc.;

APA.C PCS, LLC; APC Realty and Equipment Company, LLC; and STC Two LLC (collectively

"Sprint") infringe four United States Patents[1] (the "patents" or "Patents-in-Suit").  The patents disclose

methods for designing and implementing cellular telephone network infrastructure equipment used in

receiving and transmitting voice call traffic.  Sprint purchased the network equipment at issue from

Lucent Technologies Inc. ("Lucent").  Through a series of corporate mergers in 2006 and 2008,

Lucent became Alcatel-Lucent USA, Inc. ("ALU-USA").  ALU-USA has intervened in this lawsuit.

Sprint filed a Motion for Summary Judgment of Invalidity of All Asserted Patent Claims Due

to Nonjoinder of True Inventor (Doc. 900) ("Inventorship Motion")[2] and a Motion for Summary

Judgment on Estoppel and Laches (Doc. 1063) ("Estoppel and Laches Motion").[3]  ALU-USA filed a

Motion for Summary Judgment on License and Exhaustion (Doc. 1048) ("License and Exhaustion

---

[1] The asserted patents include: U.S. Patent No. 5,195,090 ("the '090 Patent"); U.S. Patent No. 5,305,308 ("the '308 Patent"); U.S. Patent No. 5,184,347 ("the '347 Patent"); and U.S. Patent No. 5,195,091 ("the '091 Patent").
[2] Sprint also filed a Memorandum is support of its Inventorship Motion (Doc. 901), High Point filed a response (Doc. 956), Sprint replied (Doc. 995), and High Point sur-replied (Doc. 1021).
[3] Sprint also filed a Memorandum in support of its Estoppel and Laches Motion (Doc. 1083), High Point filed a response (Doc. 1085), and Sprint replied (Doc. 1086).

Motion").[4]  On March 20, 2014, Special Master Karl Bayer issued a Report and Recommendation, wherein he recommended that Sprint's Inventorship Motion be denied; ALU-USA's License and Exhaustion Motion be granted in part and denied in part; and Sprint's Estoppel and Laches Motion be granted.  (Doc. 1087 at 1–2.)  The parties filed numerous briefs related to their objections to the Special Master's Report and Recommendation.[5]  The court has considered all the parties' papers, including the summary judgment briefing and objections to Special Master Bayer's Report and Recommendation.  The court will review de novo all objections to the findings of fact and conclusions of law made or recommended by the Special Master.  Fed. R. Civ. P. 53(f)(3); *Evolution, Inc. v. Suntrust Bank*, No. 01-2409-CM-DJW, 2004 WL 2278559, at *4 (D. Kan. Sept. 29, 2004).  For the reasons stated below, the court agrees with Special Master Bayer that Sprint is entitled to summary judgment on its defenses of equitable estoppel and laches.

## I.        Background

Approximately two decades ago, Sprint began building a nationwide wireless telephone network based on a new technology called Code Division Multiple Access ("CDMA").  Nearly every major network infrastructure equipment vendor bid to supply Sprint with the equipment necessary to build this new "all-digital" nationwide wireless network, including, AT&T Corporation ("AT&T"), the then-owner of the Patents-in-Suit.  In 1996, AT&T assigned the patents to Lucent, who owned them until 2000.  Beginning in 1996, Sprint purchased billions of dollars of CDMA infrastructure

---

[4] ALU-USA also filed a Memorandum in support of its License and Exhaustion Motion (Doc. 1049), High Point filed a response (Doc. 1053), ALU-USA replied (Doc. 1054), High Point sur-replied (Doc. 1057), and ALU-USA filed a sur-surreply (Doc. 1058), to which High Point responded (Doc. 1059) and ALU-USA replied (1060).

[5] Sprint filed a Motion for Review (Doc. 1095) and Objections to Special Master Bayer's Report and Recommendation on Inventorship (Doc. 1096), to which High Point filed its response (Doc. 1118).  ALU-USA filed a Motion to Adopt Portions of Special Master Bayer's Report and Recommendation on License and Exhaustion (Doc. 1092), to which High Point filed its response (Doc. 1106).  High Point filed Objections to Portions Special Master Bayer's Report and Recommendation on License and Exhaustion (Doc. 1117), to which ALU-USA filed it response (Doc. 1113).  ALU-USA filed Objections to Portions of Special Master Bayer's Report and Recommendation on License and Exhaustion (Doc. 1112), to which High filed it response (Doc. 1119).  Sprint filed a Motion to Adopt Special Master Bayer's Report and Recommendation on Estoppel and Laches (Doc. 1094), to which High Point filed its response (Doc. 1107) and Objections (Doc. 1116), to which Sprint filed its response (Doc. 1115).

equipment from Lucent.  Sprint also purchased infrastructure equipment from three other vendors to build out its network:  Northern Telecom, Ltd. ("Nortel"), Motorola, Inc. (now known as Motorola Solutions, Inc. and referred to herein as "Motorola"), and Samsung Telecommunications America, Inc. ("Samsung").

It was no secret that Sprint was purchasing equipment from multiple suppliers of CDMA infrastructure equipment.  Each of the vendors, including Lucent, knew that it had been awarded only a fraction of the nationwide network and that Sprint necessarily was using other vendors' equipment to build out the remainder of its network.   Moreover, Sprint told every vendor, including Lucent, about one another, insisting that they all work together to make their CDMA equipment interchangeable or "interoperable."

High Point, a non-practicing patent-assertion entity, bought the patents on March 13, 2008. Several days later, High Point sent Sprint a letter accusing Sprint of infringing on the Patents-in-Suit. Specifically, High Point alleges that the equipment Lucent sold Sprint since 1996 infringes to the extent that Sprint combined that Lucent equipment with Nortel, Motorola, and Samsung equipment. High Point also alleges that Sprint's use of equipment Lucent sold Sprint since 1996, but which Sprint did not combine with other vendors' equipment, began infringing in 2006 when, High Point claims, Lucent lost its license due to a corporate merger.

## II.    Facts

### A.  Ownership of the Patents-in-Suit

The Patents-in-Suit were granted in 1993 and 1994 to AT&T Bell Laboratories.  In 1996, AT&T spun off Bell Laboratories to form Lucent, a new public company.  AT&T transferred ownership of the Patents-in-Suit to Lucent on March 29, 1996.  In 2000, Lucent spun off portions of its business into another new company, Avaya, Inc.  On September 29, 2000, in connection with that

spin-off, Lucent transferred ownership of the Patents-in-Suit to an Avaya subsidiary, Avaya

Technology Corporation (Avaya, Inc. and Avaya Technology Corporation will be referred to

collectively as "Avaya").  In 2008, the Patents-in-Suit were bought by High Point.  At times in this

opinion, the court will refer to the owners of the Patents-in-Suit collectively as the "Patentees."

### B.  Lucent Sells CDMA Equipment to Sprint

#### 1.  First Three Procurement Contracts (1996, 1996, and 1999)

Beginning in 1996, Lucent began selling CDMA infrastructure to Sprint by way of five

procurement contracts.[6]  The first three contracts were dated 1996, 1996, and 1999—before the patents

were transferred to Avaya.  Under those procurement contracts, Lucent sold Sprint products covered

by the Patents-in-Suit and granted Sprint a license to use those products, with the following

limitations:

> [P]rovided, however, that no rights are conveyed to the Owner and its
> Affiliates with respect to any invention which is directed to (i) a
> combination of a Product or Products furnished with any other Item which
> the Vendor does not furnish to the Owner under this Contract wholly or in
> part for such use or (ii) a method or process which is other than an inherent
> use of the Products furnished.

(Doc. 1050-17 at 76; Doc. 1050-18 at 100; Doc. 1050-19 at 110–11.)  High Point argues that this

provision prohibits Sprint's use of Lucent equipment in combination with other equipment.

#### 2.  PTLA (2000)

On October 1, 2000, after the Patents-in-Suit were transferred to Avaya, Lucent's subsidiary

Lucent Technologies GRL Corp. ("Lucent GRL") and Avaya entered into an agreement entitled

"Patent and Technology License Agreement" ("PTLA") (Doc. 1050-2), which states:

---

[6] The five contracts are:  (1) Procurement and Services Contract, dated January 31, 1996 (Doc. 1050-17); (2) Amended and Restated Procurement and Services Contract, dated October 9, 1996 (Doc. 1050-18); (3) Second Amended and Restated Procurement and Services Contract, dated April 9, 1999 (Doc. 1050-19); (4) Third Amended and Restated Procurement and Services Contract, dated June 26, 2001 (Doc. 1050-20); and (5) Master Purchase Agreement for Technical Products and Related Services, dated December 5, 2010 (Doc. 1050-21).

> Avaya IPCO grants to [Lucent] GRL, under Avaya IPCO's Patents, worldwide, personal nonexclusive, royalty-free and non-transferable licenses to make, have made (subject to 3.2(b)), use, lease, sell, offer for sale and import any and all products and services of the businesses in which [Lucent] GRL or any of its Related Companies is now or hereafter engaged.

(*Id.* at 12, § 3.2(a).)  The Avaya IPCO Patents included the Patents-in-Suit because they were issued and owned by Avaya as of October 1, 2000.  Thus, the PTLA granted Lucent[7] a license to sell products covered by the Patents-in-Suit.  The PTLA further provided:

> The licenses granted herein include licenses to convey to any customer of the grantee, with respect to any licensed product which is sold or leased by such grantee to such customer, rights to use and resell such licensed product as sold or leased by such grantee (whether or not as part of a larger combination); provided, however, that no rights may be conveyed to customers with respect to any invention which is directed to [] a combination of such licensed products(s) (as sold or leased) with any other product that is not a licensed product, except to the extent that the licensed product(s) embodies a substantial and significant portion of the invention . . . .

(*Id.* § 3.4.)  Thus, the PTLA gave Lucent the right to grant licenses to its customers to use or resell the products, but not in combination with any other product that is not a licensed product, unless the licensed product embodies a substantial or significant portion of the invention.

### 3.  Fourth Procurement Contract (2001)

In 2001, Sprint purchased more CDMA network equipment from Lucent pursuant to a fourth procurement contract.  This procurement contract contained the identical limitation on combinations as the first three procurement contracts as set forth above.  (Doc. 1050-20 at 84.)

### C.  Lucent Mergers (2006 and 2008)

On November 30, 2006, Lucent merged with Aura Merger Sub, Inc. ("Aura"), a wholly-owned subsidiary of Alcatel ("2006 Merger").  This was a reverse triangular merger, whereby Aura merged

---

[7] Lucent GRL had the right to grant Lucent any sublicenses within the scope of the original license from Avaya.  (Doc. 1050-2 at 12, § 3.4(c) ("The grant of each license hereunder to each party includes the right to grant sublicenses within the scope of such license to a party's Related Companies for so long as they remain Related Companies of such party.  Any such sublicense may be made effective retroactively, but not prior to the Effective Date, nor prior to the sublicensee's becoming a Related Company of such party.").).

into Lucent under Delaware law, with Lucent surviving and becoming a wholly owned subsidiary of Alcatel.

In 2008, two Alcatel subsidiaries, Alcatel USA Marketing, Inc. and Alcatel USA Sourcing, Inc. merged into Lucent ("2008 Merger").  Lucent survived and changed its name to Alcatel-Lucent USA Inc. (previously and hereafter referred to as "ALU-USA").

### D.     Fifth Procurement Contract (2010)

In 2010, ALU-USA and Sprint executed a fifth procurement contract, under which ALU-USA sold Sprint CDMA equipment and granted Sprint "to the extent of its ability to do so . . . all necessary rights and licenses to use the Products in the form furnished by [ALU-USA] to provide telecommunication and related services."  (Doc. 1050-21 at 33.)

### III.     Analysis

Sprint began purchasing equipment from Lucent in 1996.  High Point alleges infringement in two ways: First, High Point claims infringement based upon Sprint's use of equipment Lucent sold to Sprint that Sprint combined with other vendors' equipment ("Lucent-Combined Equipment").  The Lucent-Combined Equipment is used in Sprint's IP backhaul network.

High Point also claims infringement after 2006 based upon Sprint's use of equipment it bought from Lucent that Sprint did not combine with any third-party equipment ("Lucent-Only Equipment"). The Lucent-Only Equipment is used in Sprint's frame relay backhaul network.  High Point alleges Sprint's use of the Lucent-Only Equipment began infringing when the 2006 and/or 2008 Mergers occurred.  The court will first address the Lucent-Only Equipment and then turn to the Lucent-Combined Equipment.

### A.  Lucent-Only Equipment

High Point concedes that Sprint's use of Lucent-Only Equipment did not infringe before 2006. In other words, equipment Sprint purchased from Lucent, and which Sprint did not combine with other vendors' equipment, undisputedly did not infringe until 2006.  High Point alleges that Sprint's use of Lucent-Only Equipment began infringing when Lucent merged with Aura and became a wholly-owned subsidiary of Alcatel.  Alcatel later changed its name to Alcatel Lucent.

High Point disputes that the surviving Lucent corporation was the same Lucent that participated in the 2006 Merger.  According to High Point, the 2006 Merger terminated Lucent's license to the Patents-in-Suit because (1) Lucent's rights under the PTLA could not transfer in the 2006 Merger without the express consent of Avaya and (2) under the terms of the PTLA itself, the 2006 Merger caused the license to terminate.  For the same reasons, High Point also alleges that, even if Lucent's license survived the 2006 Merger, it did not survive the 2008 Merger.

### 1.  Was there a transfer or assignment in the first place?

High Point's arguments are based on the federal presumption that a patent license may not be assigned by the licensee without the consent of the licensor.  *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 437 (6th Cir. 1979).  However, this presumption does not apply if there was no assignment of the patent license as a result of a merger.  As the Sixth Circuit held in *Cincom*, "what matters, for the purpose of determining whether the license actually transferred is if the same legal entity held the license" before and after the merger.  581 F.3d at 439 (discussing *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1096–97 (6th Cir. 1979)).  "As there is no general federal corporate law, state law will [] determine whether a merger results in the transfer of an intellectual property license."  *Cincom*, 581 F.3d at 437; *see also Evolution, Inc. v. Prime Rate Premium Fin.*

*Corp.*, No. 03-2315-KHV, 2004 WL 1824389, at *5 (D. Kan. Aug. 13, 2004) (holding that state merger statutes determine the effect of mergers with respect to assignment or transfer of licenses).

Pursuant to the 2006 Merger, Aura, a Delaware corporation, merged into Lucent, a Delaware corporation, under Delaware General Corporation Law.  Similarly, pursuant to the 2008 Merger, two Alcatel Lucent subsidiaries (Alcatel USA Marketing, Inc. and Alcatel USA Sourcing, Inc.), both Delaware corporations, merged into Lucent under Delaware General Corporation Law.  Accordingly, the court looks to Delaware merger law to determine whether the 2006 and 2008 Mergers resulted in a transfer of Lucent's patent license.[8]

The court agrees with the Special Master that *Meso Scale Diagnostics LLC v. Roche Diagnostics GMBH (Meso Scale II)*, 62 A.3d 62 (Del. Ch. Ct. 2013) is squarely on point and persuasive.  (Doc. 1087 at 16.)   Interpreting Section 259(a) of the Delaware General Corporation Law, the court in *Meso Scale II* held that "a reverse triangular merger generally is not an assignment by operation of law."  62 A.3d at 86.[9]

In *Meso Scale II*, Roche purchased BioVeris, together with its patent licenses and rights that were at issue.  62 A.3d at 72–73.  The transaction was structured as a Delaware reverse-triangular merger:

> Lili Acquisition was formed as an "acquisition subsidiary" of Roche and merged into BioVeris on June 26, 2007, with BioVeris as the surviving corporation.  As a result of the merger, "all the properties, right, privileges, powers and franchises of [BioVeris] and [Lili Acquisition] [vested] in [BioVeris], and all claims, obligations, debts, liabilities and duties of [BioVeris] and [Lili Acquisition] [became] the claims, obligations, debts, liabilities and duties of [BioVeris]."

---

[8] High Point urges the court to apply New York law, citing Section 7.6 of the PTLA, which provides that the PTLA should be governed by New York law.  However, the issue is not whether the merger breached the PLTA or whether there was a permissible assignment, but rather whether the merger constituted a transfer or assignment in the first place.  The choice-of-law provision does not apply in this circumstance; rather, the court applies the law of the merger state.

[9] The court agrees with the Special Master that *SQL Solutions, Inc. v. Oracle Corp.*, No. C-91-1079, 1991 WL 626458 (N.D. Cal. Dec. 18, 1991), is not relevant to this case because it applies California law.  (Doc. 1087 at 17.)

*Id*. at 73 (brackets in original).   Meso Scale sued under a Global Consent Agreement that specified that no "rights, interests or obligations [including patent license and rights] be assigned, in whole or in part, by operation of law or otherwise . . . ."  *Id*. at 76, 81.  The question presented in *Meso Scale II*, just like the question presented here, was whether the merger caused an assignment by operation of law to Roche of patent licenses that BioVeris possessed prior to the merger.  The Delaware Chancery Court held that it did not:

> Here, Lili Acquisition was merged into BioVeris, with BioVeris as the surviving entity.  Under Section 259, the surviving entity continued to "possess[] all the rights, privileges, powers and franchises" it had before the merger plus those of each of the corporations merged into it.  Thus, no assignment by operation of law or otherwise occurred as to BioVeris with respect to what it possessed before the merger.

*Id*. at 84 (brackets in original).

   In this case, the 2006 Merger was structured identically to the merger in *Meso Scale II*.  In the 2006 Merger, Aura was merged into Lucent under Delaware law, with Lucent as the surviving corporation.  Similarly, in the 2008 Merger, Alcatel USA Marketing, Inc. and Alcatel USA Sourcing, Inc. were merged into Lucent under Delaware law, with Lucent as the surviving corporation.  Just as "no assignment by operation of law or otherwise occurred as to BioVeris with respect to what it possessed before the merger," there was no assignment by operation of law or otherwise with respect to what Lucent possessed before the 2006 or 2008 Merger.  *Id.*  The court holds that the 2006 and 2008 Mergers did not constitute an assignment or transfer of Lucent's license in the Patents-in-Suit.

### 2.     Did the 2006 Merger or 2008 Merger violate the PTLA?

   Having determined that the 2006 and 2008 Mergers did not result in a transfer or assignment of Lucent's license, the court next reviews whether the mergers violated the terms of the PTLA, thereby causing Lucent's rights conferred by the PTLA to terminate.  Having carefully reviewed the PTLA, the court finds that neither merger violated the PTLA.

High Point points to various provisions in the PTLA confirming that the license rights granted to Lucent by Avaya were personal and non-transferable.  (Doc. 1063 at 45–46.)   The failure of these arguments, however, is that they pre-suppose that the license was assigned or transferred as a result of the 2006 or 2008 Mergers, but as discussed above, the license was not assigned or transferred, rendering High Point's arguments inapposite.  High Point also argues that the 2006 and 2008 Mergers constituted "disqualifying divestments" under Section 7.7(c) of the PTLA, (*id.* at 47–48), but Section 7.7(c) expressly applies only to the divestment of "a portion" of Lucent's business.  (Doc. 1050-2 at 18, ¶ 7.7(c).)  In the 2006 and 2008 Mergers, nothing was divested as it relates to Lucent.

The court agrees with the Special Master that other provisions contained in the PTLA suggest that Lucent's rights were not terminated upon the mergers.  (Doc. 1087 at 18.)  For example, Section 7.7(a) indicates that the PTLA inures to the benefit of successors (in addition to and distinct from assigns).   If Lucent is somehow a different entity after the mergers as High Point argues, then it is nonetheless a successor under Section 7.7(a) and therefore retained its rights under the PTLA.  Similarly, while Section 6.3 of the PTLA places restrictions on Avaya's change of control, it does not place those restrictions on Lucent.  Thus, the 2006 Merger, which resulted in a change of control, was permitted under the PTLA.  Moreover, future acquisitions are expressly contemplated by Section 3.4(c) of the PTLA, which includes the right to sublicense to "Related Companies," which is defined to include "Subsidiaries," which is defined to include companies that are "now or ***hereafter*** owned and controlled by [Lucent]."

Also in the summary judgment record is the deposition testimony of Russell W. Binns, Jr., head of Avaya's intellectual property law group, the company that owned the Patents-in-Suit at the time of the 2006 and 2008 Mergers.  Avaya, which is aligned with High Point and has a financial interest in High Point prevailing, has taken the position under oath that Lucent (thereafter ALU-USA)

remained licensed under the PTLA following the 2006 and 2008 Mergers.  (Doc. 1052-15 at 11–12.)

Mr. Binns testified that Avaya continues to do business with ALU-USA "based on the understanding

that [ALU-USA] is licensed to the Avaya patents under the license agreement and retains all of the

property rights [] under the license agreement."  (*Id.* at 12.)  Thus, the actual parties to the PTLA

continue to do business with each other on the basis that Lucent (and then ALU-USA) remained

licensed under the PTLA.  The court finds this fact indicative that the PTLA survived the 2006 and

2008 Mergers.

    The court finds that neither the 2006 Merger nor the 2008 Merger extinguished the continued

rights Lucent maintained in the equipment it sold to Sprint.  Thus, Sprint has the same rights it had

before the mergers to use the Lucent-Only Equipment.  Accordingly, with respect to the equipment

Lucent sold to Sprint that Sprint did not combine with other vendor's equipment (i.e., equipment used

in Sprint's frame relay backhaul network), the court holds that Sprint's use of this equipment does not

infringe on High Point's patent rights.

### 3.    The Alcatel License

    Back in 1996, when AT&T still owned the patents, AT&T granted Alcatel a license to make

and sell products under the Patents-in-Suit ("Alcatel License").  (Doc. 1050-14 at 3, ¶ 1.01(a).)  Thus,

even if Lucent did not survive the 2006 or 2008 Merger as High Point suggests, the Lucent-Only

Equipment remained licensed, and therefore non- infringing, because Alcatel—the company with

whom Lucent merged—had this separate license to the Patents-in-Suit that remained valid until the

patents expired.

    High Point asserts that the Patents-in-Suit are not covered by the Alcatel License because they

(the patents) were not applied for during the "three year period," as that term is defined in the Alcatel

License.  The court finds that High Point's argument is contrary to the plain language of the Alcatel

License.  In the Alcatel License, AT&T granted Alcatel a license to make, have made,

use, lease, offer to sell, and sell products under the "AT&T PARTIES' PATENTS," which is defined

in relevant part as "all LICENSED PATENTS . . . which are owned (either solely jointly with others)

or controlled at any time during the THREE YEAR PERIOD by any of the AT&T PARTIES."  (*Id.* at

12.)   The term "LICENSED PATENT," in turn, is defined in relevant part as "*any patent . . . covering

any invention for which a first application was filed* in or for any country *prior to the termination of

the THREE YEAR PERIOD*."  (*Id.* at 15 (emphasis added).)  "THREE YEAR PERIOD" is defined as

"the period commencing on January 1, 1994 and ending December 31, 1996."  (*Id.* at 16.)

It is undisputed that the filing date for the Patents-in-Suit is July 9, 1991.  Because this filing

date is prior to December 31, 1996 (prior to the termination of the three-year period), the Patents-in-

Suit are covered by the Alcatel License.  This ruling is consistent with a recent opinion issued from the

United States District Court for the District of New Jersey.  *See High Point Sarl v. T-Mobile USA, Inc.*

("*High Point v. T-Mobile*"), No. 12-1453 JEI/AMD, 2014 WL 5293092, at *6 (D.N.J. Oct. 15, 2014).

In that case, High Point, the same plaintiff in this case, sued T-Mobile USA, Inc., claiming that T-

Mobile was infringing on the same Patents-in-Suit at issue in this case.  *Id.* at *1.  The court in *High

Point v. T-Mobile* ultimately found that the patent rights in equipment sold to T-Mobile by a subsidiary

of Alcatel were exhausted.  *Id.* at *11.  In doing so, the court examined the Alcatel License, holding

that the Patents-in-Suit are covered by the Alcatel License.  *Id.* at *6 ("High Point's proposed

interpretation of the [Alcatel License] conflicts with the plain language of the agreement which only

requires that an application be filed prior to the end of the three year period, i.e., prior to December 31,

1996.").  The court holds the same in this case.

High Point also argues that the Alcatel License terminated at the 2006 and/or 2008 Merger. The court agrees with the Special Master and the *High Point v. T-Mobile* court that neither the 2006 nor 2008 Merger terminated the Alcatel License.  (Doc. 1087 at 28 ("Nothing in the [Alcatel License] would cause it to terminate" at the time of the 2006 Merger).); *High Point*, 2014 WL 5293092, at *8 ("High Point's argument that the mergers occurring in 2006 and 2008 terminated the [Alcatel License] is incorrect as a matter of law.").  As such, after the 2006 and 2008 Merger, even if the Lucent-Only Equipment did not continue to be licensed under the PTLA, the equipment became licensed under the Alcatel License.

### B.  Lucent-Combined Equipment

To build out Sprint's IP backhaul network, Sprint installed equipment purchased from Lucent alongside equipment it purchased from Samsung, Motorola, and Nortel.  High Point alleges that Sprint's use of this Lucent-Combined Equipment began infringing at the point Sprint installed the Lucent equipment with the other vendors' equipment.  High Point claims that the Lucent-Combined Equipment infringes because Sprint was not licensed to use the equipment in combination with non-Lucent equipment.  Specifically, High Point asserts that Sprint infringed the Patents-in-Suit through the testing, use, or installation of Samsung equipment beginning no later than February 21, 2001; Motorola equipment beginning no later than February 24, 2003; and Nortel equipment beginning no later than January 1, 2008.  (Doc. 1067-91 at 3.)

To begin, as assignee of the Patents-in-Suit, High Point is both bound by the actions (and inaction) of its predecessors-in-interest and imputed with their knowledge.  *See Cont'l Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377 (7th Cir. 1972); *Teradyne, Inc. v. Hewlett Packard Co.*, No. 91-0344, 1994 WL 327213, at *4 n.1, *7 n.8 (N.D. Cal. 1994) (finding that the predecessor-in-interest's "conduct and knowledge must as a matter of law be attributed to . . . its successor in interest"); *see*

*also In re Novon Int'l, Inc.*, No. 98-0677, 2000 WL 432848, at *5 (W.D.N.Y. Mar. 31, 2000) ("While the assignee of a patent becomes vested with the rights of the patentee, he also takes subject to the legal consequences of the patentee's previous acts.") (citations and internal quotations omitted).  It is especially true that a prior patent owner's delay in filing suit is attributed to subsequent patent owners. *See, e.g.*, *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) ("A patentee cannot avoid the consequences of his laches by transferring the patent."), *abrogated on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc).  High Point makes no argument to the contrary and is both bound by the conduct and imputed with the knowledge of the Patentees—AT&T, Lucent, and Avaya—all prior owners of the Patents-in-Suit.

The summary judgment record reflects that each of Patentees worked with Sprint and knew of Sprint's use of the now-allegedly-infringing equipment since Sprint began its nationwide CDMA network build-out in 1996.  None mentioned infringement until 2008, when High Point bought the Patents-In-Suit. The Special Master recommended that the doctrines of estoppel and laches bar High Point's infringement claims against Sprint.  The court agrees with the Special Master's recommendation.  As set forth more fully below, Sprint reasonably relied on Lucent's promises to support its multi-vendor CDMA network utilizing packetized backhaul.  Sprint also reasonably relied on Lucent's (and later Avaya's) silence about any potential patent infringement while Sprint invested billions of dollars in the build-out of its CDMA infrastructure equipment.

### 1.  Evidentiary Objections

High Point objected to twenty-two exhibits Sprint offered in support of its summary judgment motion.[10]  High Point claims that these press-release-type exhibits are inadmissible hearsay.  However,

---

[10] High Point objected to exhibits 76, 78–79, 103–104, 108–109, 110, 116–123, 130–134, and 139 to Sprint's Memorandum in Support of its Estoppel and Laches Motion (Doc. 1064).  These exhibits were filed at Doc. 1067.  From here forward, the court will cite to these exhibits by using the number associated with the docket entry, here Doc. 1067.

the court agrees with the Special Master that High Point's objections to these exhibits, except for Doc. 1067-11 (Exhibit 76), should be overruled.  Sprint does not offer these press releases to prove the truth of the matters asserted.  Rather, Sprint offers the exhibits to show the Patentees' notice.

As for Doc. 1067-11, Sprint offers it to prove the truth of the matter asserted—that Sprint was using the Nortel equipment in 1997 and making public pronouncements about its use.  Accordingly, to the extent Sprint uses Doc. 1067-11 to prove the truth of the matters asserted, the court sustains High Point's objection; but, to the extent Sprint offers Doc. 1067-11 to show the Patentees had notice of Sprint's activities, the court overrules High Point's objection.

High Point also objects to portions of the declaration of Jay Bluhm (Doc. 1065), claiming that the declaration lacks foundation, constitutes hearsay, and violates the best evidence rule.  Mr. Bluhm is the Vice-President of Network Planning at Sprint and testified based on his personal knowledge about the amounts Sprint spent in building its CDMA network.  Additionally, High Point objects to the deposition testimony of Gordon Caplan (Doc. 1067-19) and Harley Ball (Doc. 1067-20), claiming that neither is competent to testify about the matters for which their testimony is offered.  Harley Ball has been Sprint's in-house patent counsel for over twenty years, and Gordon Caplan has been Sprint's longtime outside counsel who negotiated the CDMA procurement contracts with Lucent, Nortel, Motorola, and Samsung from 1996 through 2005.  Each provided deposition testimony regarding how Sprint would have responded to an earlier assertion of the Patents-in-Suit.  The court finds High Point's objections are without merit and accordingly overrules the objections.

## 2.  Estoppel

Sprint has moved for summary judgment on the basis that High Point should be estopped from asserting that Sprint's CDMA network infringes on the Patents-in-Suit.  The court agrees with the

Special Master that *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)

(en banc) ("*Aukerman*") is directly on point and should guide the court's analysis.

Since the Special Master issued his Report and Recommendation, the parties have brought to

the court's attention supplemental authority related to *Aukerman*.   On May 27, 2014, High Point

argued that the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962

(2014) effectively overruled *Aukerman* in part.  (Doc. 1124.)  However, in *SCA Hygiene Products*

*Aktiebolag v. First Quality Baby Products, LLC*, 767 F.3d 1339 (Fed. Cir. 2014) ("*SCA*"), decided on

September 17, 2014, the Federal Circuit expressly rejected that contention.  In *SCA*, the Federal

Circuit noted that "*Petrella* notably left *Aukerman* intact. . . .  Because *Aukerman* may only be

overruled by the Supreme Court or an en banc panel of this court, *Aukerman* remains controlling

precedent."  *Id.* at 1345 (citation omitted).  Thus, the framework set forth by the Federal Circuit in

*Aukerman* remains controlling law.

Under *Aukerman*, to establish equitable estoppel, a defendant must show: (1) the patentee,

through misleading words, conduct, or silence, led the alleged infringer to reasonably infer that the

patentee did not intend to enforce its patent against the alleged infringer; (2) the alleged infringer

relied on that conduct; and (3) due to its reliance, the alleged infringer will be materially prejudiced if

the patentee is allowed to proceed with its claim.  *Aukerman*, 960 F.2d at 1028.  Misleading statements

or conduct may include specific statements, action, inaction, or silence where there was an obligation

to speak.  *Id.* at 1042.

Reliance is essential to equitable estoppel.  *Id.*  "To show reliance, the infringer must have had

a relationship or communication with the plaintiff which lulls the infringer into a sense of security in

going ahead with" his or her activity.  *Id.* at 1043.  Prejudice may be a change of economic position or

loss of evidence.  *Id.*  "Finally, the trial court must, even where the three elements of equitable

estoppel are established, take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the suit." *Id.*

### a.      Misleading Conduct

High Point argues that Sprint has failed to identify any statements or conduct that communicated something misleading to Sprint.  While the court recognizes this is not a typical estoppel situation where the patentee sends a letter to the alleged infringer but then does nothing to follow up, the *Aukerman* court rejected the notion that a patentee must prove intentionally misleading silence:

> How one characterizes a patentee's silence is immaterial.  Properly focused, the issue here is whether Aukerman's course of conduct reasonably gave rise to an inference in Chaides that Aukerman was not going to enforce the '133 and '633 patents against Chaides.   Moreover, silence alone will not create an estoppel unless there was a clear duty to speak, or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested.

*Id.* at 1043–44 (citations omitted).  Indeed, applying estoppel in the circumstances where there is no such letter can be even more compelling:

> A patentee who, with knowledge of the alleged infringing activity, does nothing over a period of years other than mislead a purported infringer and those who have gone before to believe that there was and is no problem, lying in wait until . . . it has become "commercially and economically worthwhile" to do something, has engaged in affirmatively misleading silence of the worst order and should not be insulated merely because, for whatever reason, it did not articulate a threat or assert a right but, rather, chose to mislead from day one.

*Stryker Corp. v. Zimmer, Inc.*, 741 F. Supp. 509, 514 (D.N.J. 1990).

Here, for more than a decade, High Point's predecessors—AT&T, Lucent, and Avaya—led Sprint to believe that there would be no allegations of patent infringement against Sprint related to the Patents-in-Suit.  Sprint relied on the activities and silence of AT&T, Lucent, and Avaya, in deciding to

build out its nationwide network, which cost Sprint billions of dollars in CDMA infrastructure equipment.  Specifically, beginning in 1995, AT&T, Nortel, and Motorola were openly competing to supply and build a CDMA infrastructure network for Sprint.[11]  AT&T never indicated that accepting any other bid would pose patent infringement concerns, and neither AT&T nor Lucent sued Sprint over the Patents-in-Suit; to the contrary, instead of asserting the patents against Sprint, Lucent actually agreed to assist Sprint in carrying out the very activity High Point now alleges constitutes infringement, remaining silent for years.

### i.  Lucent's Commitments Regarding Interoperability

Lucent's affirmation of its commitment to developing inter-vendor interoperability supports a finding that Lucent led Sprint to believe that Sprint could continue with its plans to build its CDMA network using multiple venders' equipment.  In building out its network, Sprint insisted on using at least three vendors to encourage competition and to ensure that the success (or failure) of its CDMA network would not be completely in the hands of any one supplier.  To that end, in a letter dated January 26, 1998, William Blessing, Vice President-Wireless at Sprint, made it clear to Bill Nelson, Lucent Vice President, that Sprint intended to use packetized backhaul technology network-wide, including for equipment supplied by Lucent, Motorola, and Nortel:

> First of all, I would like to say that Sprint continues to place a high value on the development of an interoperable CDMA PCS network, and shares Lucent's desire to document our respective commitments toward that goal in a manner consistent with that of Motorola and Nortel. . . .
>
> Additionally, we also wanted to document Sprint's commitment to the development of interoperable PCS equipment based on a standard supporting packet interfaces (e.g. IS-634 Rev. A).

(Doc. 1067-47 at 3.)  Then, in an agreement between Lucent and Sprint entitled "Memorandum of Understanding" ("MOU") dated May 8, 1998, "Lucent recognize[d] and agree[d] that the achievement

---

[11] In 1995, Sprint's predecessor was Sprint Telecommunications Venture.

and commercial implementation within [Sprint]'s nationwide network of an inter-vendor interoperability standard supporting packet interfaces" was "extremely important" to Sprint and "fundamental" to Sprint's business objectives.  (Doc. 1067-48 at 2, ¶ B.3.)  The MOU explicitly stated that Sprint "is a party to certain contracts . . . with Northern Telecom . . . and with Motorola . . . pertaining to the engineering and construction of personal communications services systems" and that Motorola "together with Nortel and Lucent [are] the 'Vendors.'"   (*Id.* ¶ A.1.)  Sprint and the vendors had formed an "interoperability standards ("IOS") working group," which was "in the process of defining the requirements for hardware, software and other equipment in conformance with IOS V.2 and then IOS V.3" specifications.  (*Id.* ¶ A.2.)  Accordingly, Lucent committed to develop an "inter-vendor interoperability standard supporting packet interfaces" for Sprint's nationwide CDMA network and promised to "document, publish and otherwise make available" that standard for Sprint to share with the other CDMA vendors.  (*Id.* ¶ B.3.)  Lucent's development effort would include supporting "full IOS V.3 functionality including other vendors' packet based BSC to BSC soft handoff" capabilities.  (*Id.* at 3, ¶ B.4.)  The MOU was executed by Lucent and Sprint in 1998, after Lucent had sold Sprint CDMA equipment under the First and Second Procurement Contracts.

On November 6, 1998, Lucent assured Sprint that it was committed to implementing Sprint IOS V3:  "To demonstrate our commitment to IOS, we have provided detailed development commitments and deliveries, backed by real commitments, to meet Sprint's IOS V2 and V3 requirements."  (Doc. 1067-50 at 2.)  Lucent further committed "to the continuing development of the IS634 open-A MSC to Base Station interface required by Sprint PCS in the nationwide network . . . . Lucent commits to work with Sprint PCS, Motorola, and Northern Telecom to develop future IOS specification documents."  (*Id.* at 12.)

Then, in February 2000, after Sprint agreed to purchase CDMA equipment from Lucent under the Third Procurement Contract, Lucent reaffirmed its commitment to interoperability in a four-way agreement signed by Sprint, Lucent, Nortel, and Motorola ("2000 Agreement"). (Doc. 1067-51.) The 2000 Agreement expressly referenced the Third Procurement Contract and stated that each of these vendors, pursuant to their respective contracts "have agreed to participate in the definition and development of interoperability standards (IOS) in order to work towards achieving interoperability across all CDMA infrastructure vendors . . . ." (*Id.* at 3.) In that agreement, Lucent reaffirmed "its commitment to define and develop IOS as described in the Vendor Contracts . . . and shall participate in efforts to achieve such interoperability without further request by Owner." (*Id.* at 4.)

Pursuant to the MOU and the 2000 Agreement, Lucent actively supported Sprint's efforts to implement an inter-vendor interoperability standard within its CDMA network utilizing packetized backhaul while remaining silent about the Patents-in-Suit. Indeed, there is no genuine issue that Lucent committed to inter-vendor interoperability "supporting packet interfaces," contributed to and approved of published inter-vendor interoperability specifications for use in Sprint's network, and knew of Sprint's intention to use Nortel and Motorola equipment. The court agrees with the Special Master that any reasonable persons reading Lucent's commitments to interoperability would conclude that Lucent led Sprint to believe it had no objection to Sprint building out its network using both Lucent *and* non-Lucent equipment. (Doc. 1087 at 37.)

### ii.    Lucent's Silence

In addition to Lucent's active commitments regarding interoperability, Lucent remained silent even though it knew (or should have known) that Sprint was installing infringing equipment. Indeed, from 1996 through 2000, Sprint purchased billions of dollars' worth of CDMA infrastructure equipment, software, and services from Lucent. All the while, it was widely advertised that Sprint was

operating a CDMA wireless network utilizing packet communications with infrastructure equipment purchased from other vendors.

Sprint offers evidence that there was public information available to Lucent that Sprint and its vendors were utilizing or intending to utilize packet-switch technology (as opposed to circuit-switch technology).  The court considers the following:

- Doc. 1067-11 at 7 (1997 announcement that Nortel and Lucent were providing CDMA network infrastructure equipment for Sprint);

- Doc. 1067-52 (1997 announcement that Sprint had launched a rollout of the CDMA network systems in the 1.9 GHz PCS spectrum);

- Doc. 1067-53 at 4–5 (1997 report that Nortel, like Lucent, had chosen to use packet data technology to transfer sub-rate voice traffic from the base station to BSC);

- Doc. 1067-54 (1998 publication that Sprint was using CDMA technology, which breaks messages into coded packets for transmission and reassembles them into sounds at the receiver's phone);

- Doc. 1067-55 (1998 article stating that Sprint was utilizing CDMA technology);

- Doc. 1067-56 (1999 announcement that Sprint and Motorola signed agreement to begin third-generation trial of CDMA digital wireless technology); and

- Doc. 1067-57 (2000 announcement that Sprint was deploying new cards at transceivers and receivers throughout its network to allow Sprint to move from a circuit- to packet-based network).

These public announcements provided notice[12] that Sprint (and its other vendors) were operating a CDMA network using packet-switch technology—the technology at issue in this case—yet Lucent said nothing to Sprint.

Sprint also provides evidence that there was public information available to Lucent that Sprint was actually purchasing CDMA network equipment from other vendors.  The court considers the following:

- Doc. 1067-25 (1996 announcement that Sprint was to purchase from Nortel $1 billion in equipment and services based on CDMA technology);

- Doc. 1067-38 (1997 announcement that Sprint was to purchase from Motorola and Nortel $700 million in equipment and noting that Lucent was a bidder for the contracts but lost over pricing terms); and

- Docs. 1067-13 and 1067-14 (2000 announcements that Samsung was to provide CDMA infrastructure for Puerto Rico build-out).

These public announcements provided notice that Sprint was actually purchasing CDMA infrastructure equipment from other vendors.  But again, Lucent said nothing to Sprint.

With regard to the Nortel equipment, High Point claims that Lucent (and later Avaya) did not notify Sprint of Sprint's infringement because, at the time Sprint began installing Nortel equipment, Nortel had its own license to the Patents-in-Suit.[13]  High Point contends that the Nortel equipment began infringing only when Nortel's own ten-year license to the Patents-in-Suit expired in 2007.

The court finds significant the fact that there is no evidence Lucent actually believed there was no infringement with the Nortel equipment ***based on or because of*** Nortel having its own license. With no evidence that Nortel's license was the reason for Lucent's (and later Avaya's) years of

---

[12] High Point does not dispute that Lucent collected and analyzed press releases, news articles, and other competitive intelligence during the time it owned the Patents-in-Suit.

[13] (Doc. 1067-83 (1998 Patent License Agreement between Lucent and Nortel).)

silence, this seems to be merely an after-the-fact argument.  Indeed, Lucent's silence makes sense only when the court considers Lucent's significant and ongoing relationship with Sprint.  The court believes the most persuasive inference is that Lucent did not assert an infringement claim against Sprint on the Nortel equipment—not because Lucent believed there was no infringement due to Nortel's own license—but because Lucent had no intention of suing Sprint, a valued customer that had purchased over $1 billion in CDMA infrastructure equipment.  This inference is further supported by the fact that, when the Nortel license expired in 2007, Avaya gave no notice to Sprint that Sprint's use of Nortel's equipment suddenly began infringing.  Indeed, it was not until High Point bought the Patents-in-Suit in 2008 that Sprint's use of the Nortel equipment was alleged (by High Point) to infringe beginning in 2007.

Lucent remained silent while Sprint publicly built out its network, even though Lucent was on notice that Sprint was purchasing and installing billions of dollars' worth of CDMA equipment from other vendors.  The court finds that High Point is bound by Lucent's silence.

### iii.    Avaya's Silence

As previously mentioned, Lucent transferred its rights to the Patents-in-Suit to Avaya in September 2000.  At that time of the transfer, some of the named inventors who had previously worked at Lucent, as well as the in-house patent attorney responsible for prosecuting the Patents-in-Suit, became employees of Avaya.  Moreover, Avaya's Intellectual Property Law Group consulted with Lucent and AT&T lawyers "for the purposes of facilitating legal analysis of the Patents-in-Suit, infringement issues in anticipation of litigation, and/or the transfer of certain Avaya patents, including the Patents-in-Suit."  (Doc. 1067-65 ¶ 10.)  Thus, Avaya obtained key Lucent employees and consulted with Lucent about infringement analysis, yet Avaya said nothing to Sprint.  Indeed, from the time Avaya acquired the patents in 2000, through the time Avaya sold the patents to High Point 2008,

Avaya never alleged, claimed, or otherwise notified Sprint that Avaya intended to enforce the Patents-in-Suit.

### (1)      Samsung Equipment

High Point claims that Avaya could not have said anything to Sprint because, at the time the patents were transferred, Motorola's equipment was not yet infringing and Nortel had its own license to the Patents-in-Suit.  Even if the court agreed with High Point with regard to the Motorola and Nortel equipment, the court believes that Avaya's silence in 2001 when Sprint installed the Samsung equipment in Puerto Rico was misleading.

The CDMA infrastructure equipment supplied by Samsung for Sprint's Puerto Rico market utilized packetized backhaul technology for voice calls.  High Point claims the Samsung equipment began infringing at the time Sprint installed the equipment in 2001 but that Avaya did not know Samsung's equipment infringed until 2006.  High Point also claims that Sprint's use of the Samsung equipment was so de minimis that High Point should not be charged with knowledge of that infringement.  (Doc. 1068 at 109 n.15.)  The court disagrees.

The court finds significant the fact that Lucent actually bid for the Puerto Rico contract in 2000 and (knowingly) lost the bid to Samsung.  As such, Lucent and Avaya knew what equipment Sprint was purchasing from Samsung and how that equipment would be used because Lucent bid to provide that very equipment.  Still, High Point contends that Lucent and Avaya did not know Sprint had installed Samsung equipment in 2001 that infringed.

In any event, the court does not believe that Sprint's use of the Samsung equipment was so de minimis that Avaya could not have known about the 2001 installation.  In 2002 alone, the call traffic generated by the Samsung equipment amounted to over 436 million wireless minutes.  As Sprint points out, even at a conservative ten cents per minute, that traffic would be worth $43.6 million—

hardly de minimis.  The court finds that Sprint's use of Samsung's equipment beginning in 2001 was not de minimis and that Lucent or Avaya knew, or should have known, that Sprint was infringing no later than 2001.

Additionally, Avaya continued to be placed on notice that Sprint was infringing, yet Avaya remained silent.  The court considers Sprint's evidence of additional public announcements made after the Avaya spin off.  (*See* Doc. 1067-66 (November 9, 2000 announcement that Motorola won a multi-million dollar Sprint contract to provide CDMA equipment, "based on the Interoperability Specifications standard and third generation (3G) cdma2000 1x high-speed packet data") and Doc. 1067-70 at 4 (2001 announcement that Nortel was to provide $1 billion worth of network equipment and professional services to Sprint).)

### (2)     Avaya's 2003 Patent Infringement Analysis

Even though Avaya acquired the Patents-in-Suit in 2000, Avaya admits it did not start actively analyzing the patents for potential infringement until 2003.  At that time, a group of Avaya employees and consultants began analyzing the Patents-in-Suit and conducting related research to "evaluate infringement issues . . . in order to assess opportunities to enter into licenses with, or institute litigation against, infringers of the patents."  In 2006, Avaya's patent team created claim charts comparing the claims of the Patents-in-Suit to industry telecommunications standards.  Despite being well aware of the Patents-in-Suit and actually conducting an infringement analysis regarding those patents, Avaya never approached Sprint about the Patents-in-Suit; indeed, it never mentioned them to Sprint at all.

As with Lucent, the most sensible inference as to why Avaya never made an infringement claim against Sprint is that Avaya never intended to sue Sprint because "Sprint was an ongoing and valued customer of Avaya."  (Doc. 1067-76 ¶ 2 (Avaya's Stipulation of Fact).)  Indeed, from 2000 through 2008, Sprint purchased more than fifteen million dollars' worth of Avaya products and

services and was "a valued reseller of Avaya services."  (Doc. 1067-76 ¶¶ 3 and 4.)  The court finds that High Point is bound by Avaya's silence.

In sum, the court concludes that Lucent's cooperation with Sprint on interoperability, coupled with Lucent and Avaya's silence for years, reasonably gave rise to an inference by Sprint that neither Lucent nor Avaya was going to enforce the Patents-in-Suit.  And contrary to High Point's assertion, Sprint need not establish that Lucent or Avaya acted in bad faith.  Under *Aukerman*, fraud or wrongful intent is not necessary.  690 F.2d at 1043 ("How one characterizes a patentee's silence is immaterial.").  Accordingly, the court finds the element of misleading conduct is satisfied.

### b.      Reliance

Reliance is essential to equitable estoppel.  *Aukerman*, 960 F.2d at 1043.  To show reliance, Sprint must show that it relied on the Patentees' misleading conduct in connection with taking some action.  *Id.* at 1042–43.

### i.      Sprint's Knowledge of the Patents and/or Patentee

Under *Aukerman*, in order to find reliance, "the infringer cannot be unaware—as is possible under laches—of the patentee and/or its patent."  *Aukerman*, 960 F.2d at 1042.  High Point argues that, under *Aukerman* and *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363 (Fed. Cir. 2001), an infringer must be aware of the patentee **and** its patents when it undertook the allegedly infringing activity.  However, the court disagrees that knowledge of the patent **and** the patentees is required, as the plain language of *Aukerman* includes the disjunctive conjunction "or."

Moreover, *Winbond* was an implied license case.  *Winbond*, 262 F.3d at 1374 ("An implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel.") (citing *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571 (Fed. Cir. 1997)).  In explaining one element of the test for implied license by equitable estoppel, the *Winbond* court stated that "the alleged

infringer must have knowledge of the patentee and its patent and must reasonably infer that the patentee acquiesced to the allegedly infringing activity for some time." *Id.* (citing *Aukerman*, 960 F.2d at 1042). Here, Sprint is not seeking an implied license; rather, Sprint seeks to estop High Point from asserting patent infringement based on High Point's (and it predecessors') decade-long misleading actions and silence. Therefore, the court does not find persuasive High Point's argument that knowledge of both the patents and the patentee are required to assert equitable estoppel; rather, knowledge of the patentee or the patents is sufficient. *See Infineon Technologies AG v. Volterra Semiconductor Corp.*, No. 11-6239 MMC, 2013 WL 1832558, at *4 n.6 (N.D. Cal. May 1, 2013) (rejecting argument that patent infringer must have knowledge of the asserted patents, stating that *Windbond* concerns the specific defense of implied license, not equitable estoppel in its broader form).

Even if knowledge of both the patents and the patentee is required, High Point's argument still fails. Here, there is no dispute that Sprint was aware of High Point's predecessors. Sprint executed multiple contracts with AT&T, Lucent, and Avaya—each was a supplier of equipment and services to Sprint. Sprint therefore had knowledge of patentees AT&T, Lucent, and Avaya.

With regard to knowledge of the patents, High Point argues that "Sprint admits that it was unaware of the patents in suit until March 2008, nine months before suit was filed." (Doc. 1068 at 94.) In support of that argument, High Point cites to Sprint's Statement of Fact No. 81. However, Sprint's Statement of Fact actually reads: "Sprint first became aware of High Point's ***allegations of infringement*** of the Patents-in-Suit through a March 17, 2008 letter . . . ." (Doc. 1064 at 37, ¶ 81) (emphasis added).) Like the Special Master, the court reads Sprint's Statement of Fact No. 81—not as stating Sprint was unaware of the patents until 2008—but that Sprint was unaware of High Point's allegations until that time. The court agrees with the Special Master that "[c]learly, this is an important distinction." (Doc. 1087 at 33.)

In the procurement contracts with Sprint, AT&T and Lucent acknowledged that patents covered the equipment at issue and granted a license to use that equipment.  Thus, while Sprint may not have known the four Patents-in-Suit by name or number, Sprint was aware that AT&T and Lucent had a portfolio of patents to assert in connection with the accused CDMA infrastructure equipment. The court agrees with the Special Master that the summary judgment evidence shows Sprint was aware of the patents.  (Doc. 1087 at 34.)  Sprint knew of both the Patentees and the Patents-in-Suit.

### ii.     Sprint's Multi-Billion-Dollar Investment in Infringing Equipment

High Point argues that Sprint has failed to prove it acted in reliance on the Patentees' years of acquiescence.  However, had Lucent not committed to interoperability, or had AT&T, Lucent, or Avaya notified Sprint that they intended to assert a claim for Sprint's infringement of the Patents-in-Suit, Sprint could have chosen to pursue alternatives to the allegedly infringing activity.

Sprint offers evidence that it could have purchased exclusively from Lucent or from other licensed suppliers of CDMA infrastructure equipment.  In 1998, Lucent offered to supply 100% of Sprint's equipment requirements.  (Doc. 1067-50 at 2.)  Sprint therefore could have built additional portions of its CDMA infrastructure network by purchasing CDMA equipment only from Lucent, avoiding equipment combinations altogether.  Sprint also could have negotiated a license for the Patents-in-Suit, avoided "upgrading" into alleged infringement by continuing with existing equipment, or utilized a different wireless technology, such as Global System Mobile (GSM) communications. Finally, with earlier notice, Sprint could have done a "rip-and-replace," removing and replacing the infringing infrastructure equipment.

High Point does not dispute that Sprint could have, for example, purchased solely Lucent equipment; instead, High Point claims that "Sprint does not state that it *would* have done so, which is required to show reliance."  (Doc. 1068 at 96.)  However, the Federal Circuit has made clear that an

infringer need not provide precisely what alternative paths it "would have" taken or that every equipment purchase decision was based on that reliance.  *See Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1311–12 (Fed. Cir. 2010) ("To show reliance on silence and inaction, [an accused infringer] need not prove precisely what alternative paths it would have taken.").  Thus, the central issue is whether Sprint could have pursued other business opportunities had Lucent not committed to inter-vender operability or had Lucent or Avaya given notice when the equipment began to infringe. *Id.*  Sprint has come forward with competent evidence regarding the alternatives Sprint could have pursued.[14]

High Point points to the fact that Sprint has not curtailed its wireless business since receiving the demand letter from High Point in 2008.  High Point claims this is evidence that Sprint would have acted no differently, and thus did not rely on, Lucent and Avaya's silence.  However, the court does not construe Sprint's post-lawsuit conduct as evidence of how Sprint would have acted had it been provided infringement notice years before.[15]  From 1996 through 2008, Sprint purchased more than $6.5 billion in CDMA infrastructure equipment, software, and services from its vendors, which included more than $3.5 billion in equipment from Lucent, more than $2 billion from Nortel, more than $1 billion from Motorola, and more than $40 million from Samsung.  As such, there is a stark difference in the strength of Sprint's equitable defenses it could assert after 2008, including those raised in this lawsuit, as compared to earlier years.   Sprint's post-2008 conduct is not indicative of how Sprint would have reacted had it been notified a decade before that its equipment was infringing.  High Point's argument is unpersuasive.  The court agrees with the Special Master that Sprint would

---

[14] Sprint cites to deposition testimony from Harley Ball (Doc. 1067-20), Sprint's in-house patent counsel for over twenty years, and Gordon Caplan (1067-19), Sprint's longtime outside counsel who negotiated the CDMA procurement contracts with Lucent, Nortel, Motorola, and Samsung from 1996 through 2005.

[15] The Special Master agreed with Sprint that this argument is "absurd."  (Doc. 1087 at 38 (citing Doc. 1064 at 23).)

have acted differently—not spent billions of dollars on infringing equipment—had the Patentees acted sooner.  (Doc. 1087 at 37.)  The court finds that Sprint has established reliance.

### c.    Prejudice

Equitable estoppel requires that material prejudice to the accused infringer be caused by reliance on a patentee's misleading communication.  *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 767 F.3d 1339, at *10 (Fed. Cir. 2014) (citing *Aukerman*, 960 F.2d at 1041–42).  Evidence of either a change in economic position ("economic prejudice") or a loss of evidence ("evidentiary prejudice") constitutes material prejudice sufficient for equitable estoppel.  *Aukerman*, 960 F.2d at 1042.

Economic "[p]rejudice may be shown by a change of economic position flowing from actions taken or not taken by the patentee."  *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1312 (Fed. Cir. 2010).  Heavy capital investments and increasing production can constitute economic prejudice.  *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990).  Here, Sprint poured billions of dollars into purchasing, installing, and later upgrading its equipment in pursuit of its CDMA infrastructure plan.  Those investments could have been avoided had any of High Point's predecessors-in-interest notified Sprint that (1) vendor interoperability was no longer a common goal or (2) that Sprint would be sued over equipment it bought from Lucent and combined with other vendor's equipment.  Sprint spent billions of dollars on allegedly infringing equipment while the Patentees supported and assisted Sprint in its construction and operation of the CDMA infrastructure network.  The court agrees with the Special Master that Sprint has established economic prejudice.[16] *See Adelberg*, 921 F.2d at 1272 (affirming the district court's grant of summary judgment where the alleged infringer greatly expanded its business while it had reason to believe the patent owner did not intend to assert its patents).

---

[16] "Sprint has proven billions of dollars' worth of economic prejudice."  (Doc. 1087 at 38.)

The court also concludes that Sprint has established evidentiary prejudice.  Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.  *Barrois v. Nelda Faye, Inc.*, 597 F.2d 881, 885 (5th Cir. 1979).  As detailed by the Special Master, Sprint could not overcome its burden in establishing key facts related to its Inventorship Motion.  (Doc. 1087 at 2–11.)  This was in large part due to the fact that so much time has passed, documents and correspondence have been destroyed or otherwise disappeared, memories have faded, and many folks are simply no longer able to answer important questions about the conception and reduction to practice the patent.  Sprint has suffered material evidentiary prejudice in defending this lawsuit.

The court concludes that Sprint has satisfied the three elements of equitable estoppel: misleading conduct, reliance, and prejudice.

### 3.      Laches

In addition to finding that the elements of equitable estoppel have been established, the court agrees with the Special Master that High Point is barred by the doctrine of laches.  (Doc. 1087 at 42.)  To invoke the laches defense, a defendant must prove (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant.  *Aukerman*, 960 F.2d at 1032.  When found, laches bars retrospective relief for damages.  *Id.* at 1041.

### a.      The Patentees' Delay in Filing Suit

Delays exceeding six years give rise to a presumption that the delay is unreasonable, inexcusable, and prejudicial.  *Wanless v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998).  The

presumption disappears if the patentee can identify evidence sufficient for a reasonable jury to conclude either that the delay was excusable or not unreasonable, or that it was not materially prejudicial.  *See id.*  If the patentee meets this burden, the accused infringer must prove both elements of laches by a preponderance of evidence.  *Aukerman,* 960 F.2d at 1045.

As explained in *Aukerman*, the six-year presumption for laches begins with the patentee's knowledge of infringement and counts forward.  *Id.* at 1034.  Constructive knowledge of the infringement may be "imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor."  *Wanlass*, 148 F.3d at 1338.  Indeed, the patentee who is negligently or willfully oblivious to these types of activities cannot later claim his lack of knowledge as justification for escaping the application of laches.  *Id.*

Here, Sprint argues that the Patentees' constructive knowledge of alleged infringement, and thus the starting point for unreasonable delay in bringing this lawsuit, started either on May 8, 1998 (upon Lucent's execution of the Sprint-Lucent MOU); February 28, 2000 (when Sprint, Lucent, Nortel and Motorola signed the 2000 Agreement); or in September 2001 (when High Point alleges the first calls were completed with Samsung equipment).  The court finds that, at the very latest, the Patentees knew or should have known that Sprint was infringing on the Patents-in-Suit when Sprint purchased and installed the Samsung equipment in 2001.[17]  Given that High Point sued Sprint more than six years after the Samsung installation, the presumption of laches applies.

---

[17] High Point's argument for a product-by-product laches analysis is incorrect because laches is "a single defense to a continuing tort up to the time of suit, not a series of individual defenses which must be proved as to each act of infringement, at least with respect to infringing acts of the same nature." *Aukerman*, 960 F.2d at 1031.  Here, High Point alleges infringement against Sprint's use of infrastructure equipment that handles voice packets on the backhaul, regardless of the vendor.  Sprint has been using that type of infrastructure equipment with other vendor's equipment since at least 2001 and, accordingly, laches remains a single defense to that allegation.

"[L]aches focuses on the reasonableness of the plaintiff's delay in suit," whereas estoppel focuses on what the defendant has been led to reasonably believe. *Aukerman*, 960 F.2d at 1034. Sprint benefits from the presumption of laches because High Point (through its predecessors Lucent and Avaya at the time) delayed bringing suit for more than six years after the date they either knew or should have known of Sprint's allegedly infringing activity. Accordingly, summary judgment is appropriate only if no reasonable jury could conclude that Avaya's delay was reasonable or excusable. *SCA*, 767 F.3d at 1345.

High Point alleges several potential excuses for its delay in filing suit. For example, High Point argues that Avaya's organizational creation in 2000 and reorganization in 2007 justify its delay in bringing suit. (Doc. 1068 at 117 ("[T]hese management changes in themselves excuse it.").) However, High Point cites no evidence that Avaya would have had any difficulty policing its rights due to these organizational issues, and High Point's speculation as to such difficulty does not create a genuine issue of fact. Notably, High Point itself brought this lawsuit based only on what was publicly known and without having inspected any allegedly infringing equipment. (Doc. 1064-26 at 23 (accusing Sprint of infringement three days after acquiring the patents).) The court rejects High Point's suggestion that an entity like itself—which has no actual business other than monetizing patents—was astute enough to detect potential infringement immediately, but that Avaya—a leading technology company that employed some of the named inventors of the Patents-in-Suit—was unable to detect this infringement because of the 2000 spin-off and its 2007 reorganization. Indeed, High Point is speculating because Avaya (which has a financial interest in this lawsuit) has never expressed that it delayed bringing suit because of corporate organization issues.

High Point also asserts the fact that "Avaya did not even begin to explore the prospect of the Patents-in-Suit being infringed until the end of 2003." (Doc. 1068 at 110.) As the Special Master

pointed out, "[t]hat of course is the point."  (Doc. 1087 at 42.)   Avaya chose to wait three years after it

was assigned the patents to do an infringement analysis.  High Point offers no evidence from Avaya

suggesting that the reasons for Avaya's delay are legally sufficient to overcome the presumption of

unreasonableness.   The court agrees with the Special Master that High Point has failed to come

forward with evidence that the Patentees' delay in filing suit was justified.  (*Id.*)  The court finds that

High Point has failed to establish its delay was reasonable.

### b.      Prejudice

High Point argues that Sprint has failed to establish it was prejudiced from the delay in filing

suit.  Because the presumption of laches applies, prejudice must be inferred, absent rebuttal evidence.

*Aukerman*, 960 F.2d 1020, 1037–38 (explaining the effect of the laches presumption).

High Point has failed to present rebuttal evidence that Sprint has suffered no prejudice.  The

court notes that, under the doctrine of laches, prejudice does not require reliance on the patentee's

delay.  *See SCA*, 767 F.3d at 1347 (citing *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 & n.1 (Fed. Cir.

1992)).  "[T]he question is whether . . . prejudice *resulted from* [the] delay," *Asics*, 974 F.2d at 1308,

and "there is a difference between prejudice that *results from* delay and prejudice that is due

to *reliance upon* delay," *id.* at 1308 n.1.  Economic prejudice results from a patentee's delay if the

financial losses at issue "likely would have been prevented by earlier suit."  *SCA*, 767 F.3d at 1346

(citing *Aukerman*, 960 F.2d at 1033; *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d

1057, 1066 (Fed. Cir. 2003); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed.

Cir. 1995); *Asics*, 974 F.2d at 1307–08).

For the same reasons that the court finds Sprint has shown prejudice in the equitable estoppel

context, the court finds Sprint has also shown prejudice in the laches context.  Sprint will suffer the

loss of its monetary investments—namely the build-out of its CDMA network—which likely would

have been prevented if Avaya (or Lucent) filed suit earlier.  Moreover, Sprint's ability to present a full and fair defense has been materially compromised as a result of the delay in filing suit.  Sprint has suffered material economic and evidentiary prejudice resulting from Avaya's delay, and High Point has failed to present competent evidence otherwise.  High Point has not rebutted the presumption of laches.  The court concludes that laches applies.

### 4.      Weighing the Equities

Estoppel and laches are equitable judgments of the court based on all the circumstances. *Aukerman*, 960 F.2d at 1036,1043.  As such, before applying either equitable estoppel or laches, the court must weigh all of the equities.

Following more than a decade's delay in filing suit after the Patentees' active participation with Sprint in building its allegedly infringing network, there are no equitable considerations favoring High Point's position.  Sprint has spent multiple billions of dollars creating, expanding, and upgrading its nationwide CDMA network.  Neither AT&T, nor Lucent, nor Avaya was motivated to notify Sprint of any issue regarding the Patents-In-Suit, let alone file suit, and High Point should not be permitted to claim otherwise.

High Point paid two million dollars for these broadly licensed and nearly expired AT&T patents and agreed to share any revenues it obtained with Avaya.  Equitable considerations favor Sprint over High Point, particularly given that High Point's predecessors actively encouraged Sprint to use Lucent and non-Lucent equipment.  As the Special Master acknowledged, the equities weigh in Sprint's favor.  (Doc. 1087 at 42–43.)  The court finds that Sprint's defense of laches bars relief on High Point's claims of damages accrued prior to the filing of this lawsuit.  The court also finds that Sprint's defense of equitable estoppel bars this suit entirely.

The remaining motions can be disposed of summarily.  In light of the disposition above, it is unnecessary to reach the merits of Sprint's Inventorship Motion (Doc. 900) or ALU-USA License and Exhaustion Motion (Doc. 1048).  As such, these motions are denied as moot.

**IT IS THEREFORE ORDERED** that Sprint's Motion for Summary Judgment on Estoppel and Laches (Doc. 1063) is granted.

**IT IS FURTHER ORDERED** that Sprint's Inventorship Motion (Doc. 900) or ALU-USA License and Exhaustion Motion (Doc. 1048) are denied as moot.  This case is closed.

Dated this 11th day of December, 2014, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**